[Crim. No. 11117. In Bank. Jan. 24, 1968.]

In re COLIN SCOTT BERRY et al. on Habeas Corpus.

Coleman A. Blease and Lawrence K. Karlton for Petitioners.

Albert M. Bendich, Paul N. Halvonik, Bodle, Fogel, Julber & Reinhardt, George E. Bodle, Daniel Fogel, Stephen Reinhardt and Loren R. Rothschild as Amici Curiae on behalf of Petitioners.

Thomas C. Lynch, Attorney General, Arlo E. Smith, Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, John M. Price, District Attorney, Robert Puglia, Chief Deputy District Attorney, John B. Heinrich, County Counsel, and L. B. Elam, Deputy County Counsel, for Respondent.

SULLIVAN, J.—Petitioners are charged with criminal contempt, a misdemeanor, for willful disobedience of an order of the superior court. (Pen. Code, § 166, subd. 4.) Prior to the entry by them of a responsive pleading to the complaint (see Pen. Code, §§ 949, 1002, 1003, 1004, 1016) but subsequent to their release upon posting bail, they applied for a writ of habeas corpus in the superior court, alleging that they were being illegally restrained of their liberty because the order they are charged with disobeying is void and unenforceable in that it constitutes a violation of their constitutional rights. The petition was denied without argument or opinion, and petitioners thereupon applied, on the same ground, for a writ of habeas corpus in the Court of Appeal, Third District. The Court of Appeal granted the writ as prayed for and filed an opinion. We granted the petition of the People[1] for a hearing in this court. (Pen. Code, § 1506; Cal. Rules of Court, rules 28, 29, 50.)

---

[1]The People were not a party to the original habeas corpus proceeding in the superior court. Neither were they a party to the subsequent original proceeding in the Court of Appeal until, after that court had granted the writ, they first appeared by petition for rehearing. Upon denial of that petition the People sought and were granted a hearing in this court.

The facts[2] are undisputed in all relevant respects: On February 2, 1967, the County of Sacramento (County) commenced an action in the superior court seeking an injunction. Named as defendants in this action were the Sacramento chapter of the Social Workers Union (Union), certain officers and members of the executive board thereof, 750 individual Does, and 150 John Doe associations. The complaint alleged on information and belief that the Union had voted to engage in a strike against the plaintiff County, such strike to commence on February 7, unless "meaningful negotiations" as to compensation and other matters were instituted prior to that date; that such a strike would involve mass picketing at various county facilities; and that defendants had actively encouraged county workers not members of the Union to participate in such strike and related activities. The complaint further alleged "That said strike, picketing, demonstrations and other concerted activities will inhibit, impair and frustrate the ability of Plaintiff to comply with its statutory obligations to provide public welfare services, including financial assistance to those persons entitled thereto, medical care and treatment, and other governmental services, all to the great and irreparable injury of the Plaintiff and the citizens thereof."

Plaintiff prayed, *inter alia*, for the following relief: "That Defendants and each of them, their officers, agents, servants,

---

[2]The verified petition for a writ of habeas corpus, together with points and authorities in support thereof and relevant records and other documents presented in related proceedings, was filed in the Court of Appeal on February 17, 1967. For reasons which have not been made apparent to us, the Court of Appeal issued no order to show cause in the premises but instead requested points and authorities in opposition; thus, no return was filed. However, points and authorities were submitted separately by the district attorney and the county counsel; also submitted by the latter were additional records and other documents filed in related proceedings, as well as affidavits newly filed in opposition to the petition then before the court. After decision by the Court of Appeal and the filing of the People's petition for a hearing in this court, petitioners Berry et al. filed an answer to the People's petition; to this answer they appended, *inter alia*, further records and documents filed in related proceedings. Finally, after this court had granted a hearing, the county counsel filed a brief in opposition, to which were appended, *inter alia*, still additional records, affidavits and other documents.

We are of the view that all of the indicated material is properly before us in this proceeding, and we have relied upon the same in the following statement of facts. To the limited extent that issues of fact have been raised, we consider their resolution irrelevant to a determination of the legal issues here involved; therefore the facts pertinent to contested factual points are stated as alleged by petitioners, with appropriate reference to the existence and content of disagreement.

employees, representatives and members, and all persons in active concert or participation with them, or in concert among themselves, be restrained and enjoined from doing directly or indirectly by any means, method or device whatsoever any and all of the following things:

"a. From ordering or continuing to order, or asking or requesting, or otherwise inducing or attempting to induce any employee of the Plaintiff to cease work for or not to work for the Plaintiff;

"b. From intimidating, threatening, molesting or coercing the Plaintiff or Plaintiff's agents, employees, suppliers, contractors, guests or invitees;

"c. From striking or engaging in a work stoppage or other similar concerted activity against Plaintiff, or inducing or calling a strike, work stoppage or other concerted activity against Plaintiff; and

"d. From picketing, and from placing, stationing or maintaining, or causing any picket or pickets to be stationed or maintained, and from causing, participating in or inducing others to participate in any demonstration or demonstrations on any grounds, or that portion of any private or public street which adjoins any grounds, or on any sidewalk which is contiguous to any portion of any private or public street which adjoins any grounds which are owned, possessed or controlled by the Plaintiff and on which are situated any building, buildings or structures of any kind whatsoever which are occupied by Plaintiff and in which employees of Plaintiff are assigned to work."

It was also prayed that a temporary restraining order "in accordance with this prayer" be issued ex parte, and the affidavit of the county welfare director was filed in support of this application. The affidavit stated, *inter alia*, that the membership of the Union included 564 persons in nine separate job classifications employed by the welfare department; that the welfare department was responsible for administering grants of assistance under various public social service programs; that the calling of a strike by the Union would result in irreparable damage to the ability of the welfare department to discharge its obligations to administer such programs in that (a) substantial delays in the processing of new applications for assistance would result, (b) the function of continually investigating and examining the status of recipients in such programs would be substantially impaired, (c) counselling and other specialized services to recipients would be sub-

stantially impaired, and (d) child adoption and temporary child placement programs would be substantially impaired; and that it would be impossible to recruit a sufficient number of temporary or permanent appointees with the requisite background and skill to fill vacancies resulting from a strike.

On February 2, the date of filing the complaint for injunction, the superior court issued its order that defendants show cause on February 16 why the relief prayed for in the complaint should not be granted during the pendency of the action. It also issued ex parte a temporary restraining order as prayed for by the County. (Code Civ. Proc., § 527.) This order, in language identical in all relevant respects to that contained in the prayer of the complaint, enjoined the persons named in such prayer from doing the acts therein enumerated pending the February 16 hearing on the order to show cause *in re* preliminary injunction; it additionally stated, however, that "Nothing in this Order shall be so construed as to affect the right of any employee of Plaintiff to abandon or resign his employment." Copies of this order, along with the summons, complaint, and other supporting documents, were personally served upon those eight persons who were specifically named in the complaint as officers and/or members of the executive board of the Union.

It appears that Union officials and attorneys made it known[3] that in their opinion the temporary restraining order suffered from constitutional defects which rendered it void, and that the strike would proceed as scheduled in spite of such order. On February 7 approximately 40 percent of the workers employed by the welfare department failed to appear for work, and pickets appeared in front of each of two welfare department buildings. Estimates of the number of persons involved in each of these picket lines range as high as one hundred, but it is not disputed that the picketing was orderly and peaceful. A substantial number of the pickets carried signs indicative of a strike against the County and bearing the name of the Union. Police arrived, served pickets with copies of the summons, complaint for injunction, and

---

[3]The county counsel has filed as exhibits certified copies of newspaper articles purporting to describe events which occurred immediately prior to or after the issuance of the temporary restraining order on February 2. Without pausing to consider the problems of hearsay thus presented, we note that one of these articles, which appeared on February 3, reflects (1) the opinion of Union attorneys as to the constitutional overbreadth of the order, and (2) the determination of Union officials to proceed with the strike in spite of the order.

temporary restraining order, and ordered the pickets to disperse. Those who refused to do so were arrested.

For approximately thirty days following February 7 members of the Union, together with private persons in sympathy with their aims, continued peaceful picketing activities on sidewalks in front of the two welfare department buildings and in front of the County Administration Building.[4] As a result of these activities over eighty persons were arrested and charged with violation of section 166 subdivision 4 of the Penal Code—criminal contempt of court.[5]

At no time during the five days intervening between the issuance of the temporary restraining order and the commencement of the strike did the Union or any other defendant seek to have the order vacated or modified. (See Code Civ. Proc., §§ 532, 533, 937.) On February 16, the date set for hearing on the order to show cause *in re* preliminary injunction, the Union through its attorneys requested and was granted a continuance of the hearing until February 27. Hearing was had on that date, and on March 3 the preliminary injunction was granted; this order, in language identical in all relevant respects to that contained in the prayer of the complaint and in the temporary restraining order, enjoined the same persons from engaging in the same acts during the pendency of the action for permanent injunction.

The four petitioners herein were among those arrested and charged with criminal contempt for willful disobedience of the temporary restraining order. In their verified petition it is alleged that each is a private citizen and is in no way affiliated with the Union, the County, or the welfare department; that each picketed before a county building on a date after commencement of the strike; that each, after being served with a copy of the temporary restraining order while so picketing, refused to disperse after being ordered to do so and was arrested; that each was charged with criminal contempt for disobedience of the temporary restraining order; and that

---

[4]It appears that unauthorized absences from work also continued at least until February 14. On that date the welfare director filed his affidavit in support of the application for preliminary injunction, wherein he alleged that continuing unauthorized absences had in fact brought about those effects upon the department and its functions which were predicted in the affidavit in support of the temporary restraining order.

[5]Section 166 provides in relevant part that ''Every person guilty of any contempt of court, of either [*sic*] of the following kinds, is guilty of a misdemeanor: . . . 4. Willful disobedience of any process or order lawfully issued by any court; . . .''

each has been released on bail pending trial.[6] They seek habeas corpus on the ground that the temporary restraining order with whose willful violation they are charged is void and unenforceable in that it constitutes a violation of their rights under the First and Fourteenth Amendments to the United States Constitution, as well as corresponding provisions of the California Constitution.

We conclude preliminarily that habeas corpus is an appropriate remedy under the circumstances of the case at bench.

 It is well settled that a court is without jurisdiction to subject a citizen to criminal prosecution for violation of an unconstitutional *statute* or *ordinance*, and that habeas corpus will lie prior to trial in order to effect his release from actual or constructive[7] restraint. (*In re Petersen* (1958) 51 Cal.2d

---

[6]The petition sets forth specific facts relating to the arrest of each petitioner, which we summarize as follows: Colin Scott Berry is a student at Sacramento State College and is in no way affiliated with the Union, the County or the welfare department. On February 9, 1967, at about 4:30 p.m., he arrived at the County Administration Building and began to walk up and down on the sidewalk in front of the building along with a number of other private citizens. He carried a sign which read ''Citizens Support Social Workers Strike.'' At approximately 5 p.m., 15 police officers arrived, and Berry, along with the other pickets was presented with a copy of the restraining order. The police then ordered all present to disperse, and six persons complied. When Berry did not comply and continued to walk up and down with his sign, he was warned that he would be arrested if he did not leave. Berry continued his course of conduct in spite of this warning and was arrested.

Alan B. Hall, Jack Robinson, and Meredith Crown are private citizens and are in no way affiliated with the Union, the County, or the welfare department. On February 10, 1967, they appeared at the County Administration Building and began to walk up and down on the sidewalk in front of the building. Each carried a blank rectangle of light cardboard. Police arrived, presented each with a copy of the restraining order, and warned that arrest would ensue if they did not leave the scene. They continued their conduct and were arrested.

Among the affidavits filed by the County herein are those of the arresting officers. The affidavit relating to the arrest of petitioner Berry alleges *inter alia* that he, after being served with the temporary restraining order and other relevant documents, and after being ordered to cease picketing, left the scene along with the other pickets and placed his sign in his car; but that he returned alone a few minutes later, began to picket with his sign, and was arrested. The affidavit relating to the arrests of petitioners Hall, Robinson, and Crown alleges *inter alia* that they were among some twenty persons who were picketing before the County Administration Building immediately preceding their arrest; that all of such persons ''carried signs, some of which were blank rectangular pieces of light cardboard, and others of which stated: 'SOCIAL WORKERS UNION, LOCAL 535, B.S.E.I.U., AFL-CIO,' and 'ON STRIKE AGAINST SACRAMENTO COUNTY' ''; and that petitioners Hall, Robinson, and Crown were among those persons who carried blank rectangular pieces of light cardboard.

[7]The fact that a petitioner has been admitted to bail of course does not preclude examination by habeas corpus of the lawfulness of his con-

146

177, 181 [331 P.2d 24]; *In re Deane* (1937) 8 Cal.2d 599, 600 [67 P.2d 333]; *In re Smith* (1904) 143 Cal. 368, 373 [77 P. 180]; *Ex parte Keeney* (1890) 84 Cal. 304, 310 [24 P. 34]; *Matter of Zany* (1912) 20 Cal.App. 360, 371 [129 P. 295].)

We think it equally clear that one actually or constructively restrained pending a contempt prosecution for violation of an unconstitutional *court order* may seek release from such restraint by habeas corpus. Moreover, in the circumstances of this case such relief is not barred by the failure of petitioners to challenge directly the jurisdiction of the municpal court and thus give that court the opportunity to examine its own jurisdiction in light of the constitutional contentions here made. The sole method available for launching such a challenge prior to trial is by a demurrer (Pen. Code, §§ 1002-1004), which reaches only defects appearing on the face of the accusatory pleading. (Pen. Code, § 1004.) Since the order whose constitutional validity is here challenged was neither set forth nor referred to, other than generically, in the original complaints,[8] the matters presently at issue could not have been raised by demurrer. The remedy of habeas corpus is appropriate in these circumstances; we proceed to the merits of the controversy.

At the threshold of the inquiry we are met with the County's contention that questions of the constitutionality of the temporary restraining order are irrelevant to the instant proceeding. It is urged that the superior court, having subject matter and personal jurisdiction in the premises, had the power to preserve existing conditions while it was in the process of determining the substantial question of its authority to grant the injunctive relief sought, and that the temporary restraining order, as an expression of that power, was to be obeyed upon pain of contempt regardless of its constitutional validity as ultimately determined. The County additionally argues that the failure of petitioners to seek vacation or modification of the order through available legal means prior to their willful violation of it precludes their mounting a constitutional challenge in the context of contempt proceedings resulting from such disobedience.

structive restraint. (*In re Petersen* (1958) 51 Cal.2d 177, 181 [331 P.2d 24].)

[8]It apears that on February 21, 1967, four days after the petition for writ of habeas corpus was filed in the Court of Appeal, the original complaints were amended so that specific reference was made to the temporary restraining order. We, of course, do not condition habeas corpus relief upon the exhaustion of remedies not available at the time of the petition.

These arguments are logically separate and will be so treated. The first constitutes an effort to apply the rationale of *United States* v. *United Mine Workers* (1947) 330 U.S. 258 [91 L.Ed. 884, 67 S.Ct. 677], to the instant case. As has been cogently observed, however, "Whatever be the extent to which the federal courts may apply this doctrine, it is not the law in California." (1 Witkin, Cal. Procedure (1954) § 155, p. 421.) ▮ In this state it is clearly the law that the violation of an order in excess of the jurisdiction of the issuing court cannot produce a valid judgment of contempt (*Fortenbury* v. *Superior Court* (1940) 16 Cal.2d 405, 407-408 [106 P.2d 411]; *Brady* v. *Superior Court* (1962) 200 Cal.App.2d 69, 73 [19 Cal.Rptr. 242]; *Grant* v. *Superior Court* (1963) 214 Cal.App.2d 15, 19-20 [29 Cal.Rptr. 125]; 1 Witkin, Cal. Procedure (1954) § 155, pp. 421-422), and that the "jurisdiction" in question extends beyond mere subject matter or personal jurisdiction to that concept described by us in *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, at page 291 [109 P.2d 942, 132 A.L.R. 715]: "Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis,* are in excess of jurisdiction, . . ."

In *Fortenbury* v. *Superior Court, supra,* 16 Cal.2d 405, petitioner had been held in contempt of court for violating a temporary restraining order prohibiting picketing in connection with a labor dispute. Reviewing the judgment by writ of certiorari, we held that the order was in violation of petitioner's constitutional rights under the First Amendment, that the superior court was therefore without jurisdiction to issue it, and that petitioner should not have been adjudged guilty of contempt. We annulled the judgment. ▮ It is therefore clear that a temporary restraining order constitutionally void on its face is issued in excess of jurisdiction and cannot sustain a contempt judgment based upon its violation.

The case of *Signal Oil etc. Co.* v. *Ashland Oil etc. Co.* (1958) 49 Cal.2d 764 [322 P.2d 1], although it cites the *United Mine Workers* case and contains language heavily relied upon by the County herein, is clearly in harmony with the principles above expressed. There the superior court had issued a temporary restraining order enjoining acts in violation of a certain agreement, which acts were nevertheless undertaken. Subsequently the Supreme Court of Delaware

held that the agreement was void. In the meantime the superior court had issued a preliminary injunction enjoinin; the parties from giving any effect to the acts performed in violation of the temporary restraining order and from undertaking future acts in violation of the agreement. We held, on appeal from the order granting the preliminary injunction, that such injunction should be vacated insofar as it purported to enforce future compliance with the void agreement, but that it should be sustained insofar as it forbade recognition of the acts undertaken in violation of the temporary restraining order. In answer to the contention that the court lacked "jurisdiction" to issue a temporary restraining order enforcing compliance with a void agreement, and that acts undertaken in violation of that order should therefore be given recognition, we concluded that the order suffered from no jurisdictional defect because the invalidity of the agreement did not appear upon the face of the order. "As noted hereinabove, the invalidity of the Agents' Agreement in this case does not appear as a matter of law on the face of the complaint or the restraining order, and the relief granted was not of a character which 'under no circumstances' it had 'any authority to grant.'" (49 Cal.2d at p. 778; see *Vasquez* v. *Vasquez* (1952) 109 Cal.App.2d 280, 284 [240 P.2d 319].) Although the *Signal Oil* case might be considered as holding that a temporary restraining order issued on the basis of *an error of law of less than constitutional stature is* not issued in excess of jurisdiction, it in no way detracts from the clear holding of *Fortenbury* that such an order is issued in excess of jurisdiction, and therefore cannot support a contempt judgment, when it is unconstitutional on its face. (See *Brady* v. *Superior Court, supra,* 200 Cal.App.2d 69, 75-76.)

The County's second contention on this point is, as indicated above, that petitioners cannot now be heard to raise objections as to the constitutional overbreadth or vagueness of the order in view of the fact that they failed to seek modification or vacation of it prior to their acts of willful disobedience. It is clear, however, that the law of California is to the contrary. ■ In this state a person affected by an injunctive order has available to him two alternative methods by which he may challenge the validity of such order on the ground that it was issued without or in excess of jurisdiction. He may consider it a more prudent course to comply with the order while seeking a judicial declaration as to its jurisdictional validity. (See *Mason* v. *United States Fid. & Guar. Co.*

(1943) 60 Cal.App.2d 587, 590-591 [141 P.2d 475].) On the other hand, he may conclude that the exigencies of the situation or the magnitude of the rights involved render immediate action worth the cost of peril. In the latter event, such a person, under California law, may disobey the order and raise his jurisdictional contentions when he is sought to be punished for such disobedience. If he has correctly assessed his legal position, and it is therefore finally determined that the order was issued without or in excess of jurisdiction, his violation of such void order constitutes no punishable wrong. (See *Kreling* v. *Superior Court* (1941) 18 Cal.2d 884 [118 P.2d 470]; *In re Carroll* (1933) 135 Cal.App. 672, 677 [28 P.2d 84]; *Chaplin* v. *Superior Court* (1927) 81 Cal.App. 367, 378 [253 P. 954]; cf. *In re DeSilva* (1948) 33 Cal.2d 76, 79 [199 P.2d 6]; see also 1 Witkin, Cal. Procedure (1954) § 155, p. 422.) If, however, the final judicial determination is otherwise he may be punished. In the instant case petitioners have chosen the more perilous of the two courses open to them; the wisdom of their choice is here to be determined.

The recent case of *Walker* v. *City of Birmingham* (1967) 388 U.S. 307 [18 L.Ed.2d 1210, 87 S.Ct. 1824], upon which the County places great reliance, raises no barrier preventing present consideration of petitioners' constitutional contentions. There defendants had participated in a civil rights demonstration in spite of a court order restraining such participation. In the course of subsequent contempt proceedings they sought to show that the order with whose disobedience they were charged was unconstitutionally vague and overbroad. However, the Alabama circuit judge, "pointing out that there had been neither a motion to dissolve the injunction, nor an effort to comply with it by applying for a permit from the city commission before engaging in the Good Friday and Easter Sunday parades," concluded that the only issues before him were whether there was subject-matter jurisdiction to issue the order, and whether petitioners had knowingly violated it. The Supreme Court of Alabama, in affirming the convictions, also declined to consider petitioners' constitutional attacks upon the injunction and underlying ordinance, stating: "We hold that the circuit court had the duty and authority, in the first instance, to determine the validity of the [parade] ordinance, and, until the decision of the circuit court is reversed for error by orderly review, either by the circuit court or a higher court, the orders of the circuit court based on its decision are to be respected

and disobedience of them is contempt of its lawful authority, to be punished. *Howat* v. *State of Kansas,* 258 U.S. 181 [66 L.Ed. 550, 42 S.Ct. 277].'' (388 U.S. at p. 313 [18 L.Ed.2d at p. 1215], quoting from 279 Ala. 53, 60, 62-63 [181 So.2d 493].)

The Supreme Court of the United States set forth the issue before it in the following terms: ''In the present case . . . we are asked to hold that this rule of law, upon which the Alabama courts relied, was constitutionally impermissible.'' The court refused to so hold, with four justices dissenting. The majority laid emphasis upon the particular circumstances of the case before the court, noting that ''this is not a case where the injunction was transparently invalid or had only a frivolous pretense to validity.'' (388 U.S. at p. 315 [18 L.Ed.2d at p. 1217].) It was conceded that both the order and the ordinance underlying it were ''subject to substantial constitutional question,'' but the court held that Alabama's insistence upon recourse to legal channels in order to raise such issues was constitutionally permissible, at least where the order was not void on its face.

The County herein relies heavily upon the *Walker* case in an effort to sustain its position that petitioners must be precluded from raising constitutional objections to the subject order because they did not seek its modification or vacation prior to their willful disobedience of it. It is apparent, however, that the *holding* of the *Walker* case, as distinguished from its language, is only that the rule of law followed by the State of Alabama did not, in the particular circumstances of that case, constitute an intrusion upon First Amendment freedoms. In California, as we have shown above, the rule followed is considerably more consistent with the exercise of First Amendment freedoms than that adopted in Alabama, and it is therefore difficult to perceive how the *Walker* decision is of relevance herein. Further, it is notable that the majority in *Walker* indicated that the Alabama rule might be constitutionally impermissible in a case wherein the order or ordinance involved was unconstitutional on its face, or was ''transparently invalid or had only a frivolous pretense to validity.'' Thus it appears that the *Walker* decision is consistent with the California rule that an order void upon its face cannot support a contempt judgment.

We proceed to an examination of petitioners' contention that the temporary restraining order which they are charged with disobeying is constitutionally overbroad and vague, and is therefore void on its face.

As we have indicated, the order in question incorporated in all relevant respects the language of the prayer for injunction, which we have set forth in full *supra*.[9] In summary, the order forbade "the Defendants above named,"[10] their representatives of various descriptions, "and all persons in active concert or participation with them or in concert among themselves," from "directly or indirectly by any means, method or device whatsoever" doing any of the following: (1) ordering, asking, requesting "or otherwise inducing or attempting to induce" any employee of the County to stop working for the County; (2) "intimidating, threatening, molesting or coercing" the County or its representatives, employees, suppliers, or invitees; (3) "striking or engaging in a work stoppage or other similar concerted activity" against the County, or "inducing" such strike, stoppage, or similar concerted activity; and (4) picketing or causing picketing, or "causing, participating in or inducing others to participate in any demonstration or demonstrations" on any grounds or street or sidewalk adjoining grounds owned or possessed by the County on which structures are located which are occupied by county employees or in which such employees "are assigned to work." ▮ As we shall explain below, we have concluded that this order is unconstitutionally overbroad in that it improperly restricts the exercise of First Amendment freedoms, and further that it is too vague and uncertain to satisfy the requirements of notice and fair trial which are inherent in the due process clause of the Fourteenth Amendment.

We emphasize at the outset that our decision in the instant case renders unnecessary a present determination of the question whether strikes by public employees can be lawfully enjoined. We do not address ourselves to that question, and we here express no opinion upon it. Rather, our consideration of the order here at issue proceeds upon the assumption that public employees may be lawfully enjoined from striking and from carrying on specific activities in support of a strike, and we conclude that, even upon this assumption, the order violates constitutional safeguards.

[9]The prayer for injunction designated the four groups of proscribed acts by the letters a, b, c, and d. The temporary restraining order designated the same groups by the numerals 1, 2, 3, and 4. We adopt the latter designation hereafter.

[10]As we have indicated, the defendants set forth in the temporary restraining order and order to show cause were the Union, eight officers and directors thereof, 750 Does, and 150 Doe associations.

It is clear initially that the temporary restraining order before us is not limited to the prohibition of a threatened strike.[11] On the contrary, it also proscribes a vast range of activities which the Union and its supporters might properly utilize in order to voice and publicize their demands. Thus, section (4) of the order prohibits *all* picketing and demonstrations before buildings in which county employees are assigned to work. This clearly includes not only picketing and demonstrations in support of a strike, but also mere informational picketing and demonstrations designed to communicate the content of grievances and mobilize public support. It is clear that such informational picketing and demonstration, far from promoting or advocating a strike, might be utilized in the hope of eliminating by intellectual persuasion the need for more drastic action.[12] It is clear that peaceful picketing is an activity subject to absolute constitutional protection in the absence of a valid state interest justifying limitation or restriction. (See *Schwartz-Torrance Inv. Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766, 770 [40 Cal.Rptr. 233, 394 P.2d 921].) Although we have assumed for present purposes that an interest justifying proscription of strike activities (including picketing and demonstration advocating or supporting a strike) here exists, the County has advanced no tenable

[11]As will appear, our consideration of the validity of the temporary restraining order will not be limited to its effect in the circumstances of the cases before us. "'. . . where a provision restricting free speech and the free dissemination of ideas is involved, a court in considering the claim of overbreadth and vagueness may take into account the operation of the provisions as to factual situations other than the one at bar. (*N.A.A.C.P.* v. *Button, supra,* 371 U.S. 415, 432-433 [9 L.Ed.2d 405, 417-418, 83 S.Ct. 328]; *Thornhill* v. *Alabama* (1940) 310 U.S. 88, 96-99 [84 L.Ed. 1093, 1098-1100, 60 S.Ct. 736]; *In re Blaney* (1947) 30 Cal.2d 643, 650-653 [184 P.2d 892]; *In re Porterfield* (1946) 28 Cal.2d 91, 115 [168 P.2d 706, 167 A.L.R. 675]; *In re Bell* (1942) 19 Cal.2d 488, 495-496 [122 P.2d 22].)'" (*Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331, 339 [38 Cal.Rptr. 625, 392 P.2d 385]; see also *Bagley* v. *Washington Township Hospital Dist.* (1966) 65 Cal.2d 499, 508-509 [55 Cal.Rptr. 401, 421 P.2d 409].) We pointed out in *Fort,* at page 339, that this rule is usually applied in connection with criminal statutes, but that it was "appropriate whenever a provision too broad or vague, if allowed to stand, would amount to a coercive restraint of free speech, . . .'" In the instant case, as in *In re Blaney* (1947) 30 Cal.2d 643 [184 P.2d 892], we apply this rule of broad examination to a civil directive whose "coercive" effect arises from the fact that the contempt sanction is available for its enforcement.

[12]We are unable to ignore the possibility that a prohibition of the breadth here manifested may in fact bring about work stoppage by eliminating informational alternatives. (Cf. *Edwards* v. *South Carolina* (1963) 372 U.S. 229, 235-236 [9 L.Ed.2d 697, 701-702, 83 S.Ct. 680].)

argument as to the existence of a governmental interest which would justify the proscription of purely informational picketing or demonstration.

We believe that the leading case of *Thornhill* v. *Alabama* (1940) 310 U.S. 88 [84 L.Ed. 1093, 60 S.Ct. 736] (see fn. 11, *ante*), although involving a different factual background, clearly enunciates the principles which govern us in the case at bench. There petitioner, a member of a group of persons picketing their former employer, was convicted under an Alabama criminal statute which generally forbade picketing or loitering upon or near the premises of a business firm for the purpose of influencing or inducing persons not to deal with it, or of hindering its business. The United States Supreme Court held that the statute was invalid upon its face, observing that it was the kind of directive "which does not aim specifically at evils within the allowable area of state control but, on the contrary, sweeps within its ambit other activities that in ordinary circumstances constitute an exercise of freedom of speech or of the press." (310 U.S. at p. 97 [84 L.Ed. at p. 1100].) The court continued: "The range of activities proscribed by § 3448, whether characterized as picketing or loitering or otherwise, embraces nearly every practicable, effective means whereby those interested—including the employees directly affected—may enlighten the public on the nature and causes of a labor dispute. The safeguarding of these means is essential to the securing of an informed and educated public opinion with respect to a matter which is of public concern. . . . Every expression of opinion on matters that are important has the potentiality of inducing action in the interests of one rather than another group in society. But the group in power at any moment may not impose penal sanctions on peaceful and truthful discussion of matters of public interest merely on a showing that others may thereby be persuaded to take action inconsistent with its interests. Abridgment of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion." (Pp. 104-105 [84 L.Ed. at pp. 1103-1104] ; fn. omitted.)

In *Thornhill*, as in the instant case, the state urged that the directive in question sought to protect legitimate public interests. The interests there in question were those of preservation of public peace and safety; the interests con-

cerned in the instant case are those of insuring efficient accomplishment of governmental functions. The *Thornhill* court concluded that the state had chosen too blunt an instrument to effect its legitimate aims: "Section 3448 in question here does not aim specifically at serious encroachments on these interests and does not evidence any such care in balancing these interests against the interest of the community and that of the individual in freedom of discussion on matters of public concern." (310 U.S. at p. 105 [84 L.Ed. at p. 1104].) We conclude similarly that no governmental interest has been shown which will justify proscription of the vast range of activities sought to be forbidden by the temporary restraining order in question.

Our conclusion on this point is not altered by the fact that section (4) of the order forbids picketing and demonstration only in a limited area, to wit, before public buildings where county employees "are assigned to work." The indicated areas are the very places where communication of the content of the Union's grievances would be most effective. (See *Edwards* v. *South Carolina* (1963) 372 U.S. 229, 235-236 [9 L.Ed.2d 697, 701-702, 83 S.Ct. 680].) Again, the County has fallen far short of demonstrating a compelling public interest sufficient to justify limitation of *informational* picketing and demonstration per se in the locations where the order forbids such activities. (Cf. *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242].)

 Other language in the order compounds the effect of the indicated intrusion into the area of protected expression. Section (4) forbids "inducing others to participate" in demonstrations. Section (3) forbids "inducing or calling a strike, work stoppage or *other concerted activity*" (italics added) against the County. It is clear that this language is broad enough to include the distribution of literature, the circulation of petitions, the publication of articles, and much other Union activity in connection with its grievances against the County. Even if we assume, as we have done above, that all such activity would be properly enjoinable insofar as it advocated a strike by public employees, still a vast area of constitutionally protected activity falls within the wide reach of the ban.

Further, it appears that even sections (1) and (2) of the order are so broadly worded "as to permit within the scope of [their] language the punishment of incidents fairly within the protection of the guarantee of free speech. . . ." (*Win-*

*ters* v. *New York* (1948) 333 U.S. 507, 509 [92 L.Ed. 840, 846, 68 S.Ct. 665].) Section (1), which generally forbids ordering, requesting or otherwise inducing any county employee to cease work, does not limit its ban to efforts undertaken in support of a strike and is on its face applicable to efforts undertaken for innocent purposes. Section (2), which generally forbids coercive or intimidating acts against county employees and persons with whom the County deals in the course of discharging its functions, is on its face similarly applicable to acts wholly unconnected with the strike.

■ We are not persuaded by the County's argument that these sections must be viewed "in context" in order to supply the necessary limitation. Even if we were to agree that the "context" of the order provides *some* indication that the acts set forth in sections (1) and (2) are proscribed only insofar as they relate to strike activities (which activities we have above assumed to be properly enjoinable), it is clear that constitutionally permissible restrictions upon the exercise of First Amendment rights (see *Sherbert* v. *Verner* (1963) 374 U.S. 398, 406-407 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790]) must be drawn with a narrow specificity calculated to prevent repression of expressive activities as to which restriction is constitutionally forbidden. (See *N.A.A. C.P.* v. *Button* (1963) 371 U.S. 415, 433 [9 L.Ed.2d 405, 418, 83 S.Ct. 328]; *Shelton* v. *Tucker* (1960) 364 U.S. 479, 488-490 [5 L.Ed.2d 231, 237-239, 81 S.Ct. 247]; *Fort* v. *Civil Service Com.* (1964) 61 Cal.2d 331, 337 [38 Cal.Rptr. 625, 392 P.2d 385].) When restrictions in the area of free expression are at issue, an appeal to "context" is insufficient to satisfy constitutional requirements of precision.

We conclude that each of the four sections by which the subject order describes the activities forbidden is so broadly drawn as to include within its reach activities fairly within the protection of constitutional guarantees of free speech and expression.

■ Finally, turning our attention from the scope of activity proscribed by the order, we observe that the description of the group to which such proscription applies is vague and indefinite. As shown above, the order is directed not only to the Union and its representatives, but also to "all persons in active concert or participation with them or *in concert among themselves.*" (Italics added.) We recognize that the direction of injunctive orders to persons "in active concert or participation with" specifically named parties defendant

is approved by long-standing custom and practice,[13] and we agree that an ascertainable class of persons is described by such language. However, the additional language which we have underscored, i.e. "in concert among themselves," injects into the description a baffling element of uncertainty as to the application of the order to persons wholly unaffiliated with the Union or with other specifically named parties defendant.[14] A directive "in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Constr. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126].) A valid judgment of contempt cannot be based upon such a directive. "The judicial contempt power is a potent weapon. When it is founded upon a decree too vague to be understood, it can be a deadly one." (*International Longshoremen's Assn.* v. *Philadelphia Marine etc. Assn.* (1967) 389 U.S. 64, 76 [19 L.Ed.2d 236, 245, 88 S.Ct. 201, 208].)

The combination of what we have termed the "overbroad" and the "vague" aspects[15] of the order in question render it a model of overreaching and confusion. We therefore consider that the doctrine of severance cannot reasonably be applied. ▆▆▆ "Where a provision encompasses both valid and invalid restrictions on free speech and its language is such that a court cannot reasonably undertake to eliminate its invalid operation by severance or construction, the provision is void in its entirety regardless of whether the par-

[13]See the practice forms set forth in 1 Civil Procedure Forms Manual (Cont. Ed. Bar 1967) p. 113, and Civil Procedure Before Trial (Cont. Ed. Bar 1957) pp. 625-627. The indicated language has the approval of statute in the federal courts. (See Fed.R.Civ.P. 65(d).)

[14]We note in passing our grave doubts as to the jurisdictional validity of an injunctive order directed to persons other than the parties defendant, their representatives, and persons in active concert or participation with them. (See and compare Fed.R.Civ.P. 65(d).)

[15]It has been suggested by one thoughtful commentator that "overbreadth" and "vagueness" are but doctrinal aspects of a broader defect known as "unconstitutional uncertainty"—which defect appears whenever the language of a directive supported by penal sanction "injects into the governmental wheel so much free play that in the practical course of its operation it is likely to function erratically—responsive to whim or discrimination unrelated to any specific determination of need by the responsible policy-making organs of society—and to result in a significant number of impermissable public-versus-private-interest resolutions which are beyond the effective discovery or appraisal of the Court." (Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67, 90; cf. *Thornhill* v. *Alabama, supra,* 310 U.S. 88, 97-98 [84 L.Ed. 1093, 1099-1100].)

ticular conduct before the court could be constitutionally regulated and whether there is a severability clause applicable to the provision." (*Fort* v. *Civil Service Com., supra,* 61 Cal.2d 331, 339; see *In re Blaney* (1947) 30 Cal.2d 643, 655-656 [184 P.2d 892] ; *People* v. *Stevenson* (1962) 58 Cal.2d 794, 798 [26 Cal.Rptr. 297, 376 P.2d 297].)

We hold that the order which petitioners are charged with disobeying is unconstitutionally overbroad in that it unnecessarily restricts the exercise of First Amendment rights; that the order is too vague and uncertain to satisfy the requirements of notice and fair trial which are inherent in the due process clause of the Fourteenth Amendment; that the doctrine of severability is here inapplicable; and that the order is therefore void in its entirety. These determinations, in light of the principles above expressed, compel our conclusion that the temporary restraining order in question was issued in excess of the jurisdiction of the superior court, that petitioners are therefore unlawfully restrained of their liberty, and that the relief prayed for must be granted.

The writ is granted and the petitioners ordered discharged.

Traynor, C. J., Peters, J., Tobriner, J., Mosk, J., and Burke, J., concurred.

McComb, J., dissented.